# United States Court of Appeals
## For the First Circuit

No. 15-1343

UNITED STATES OF AMERICA,

Appellee,

v.

CRAIG MERCER,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. George Z. Singal, U.S. District Judge]

Before

Torruella, Lynch, and Barron,
Circuit Judges.

K. Hayne Barnwell for appellant.
Margaret D. McGaughey, Assistant United States Attorney, with
whom Thomas E. Delahanty II, United States Attorney, was on brief,
for appellee.

August 17, 2016

**BARRON**, **Circuit Judge**.  Craig Mercer challenges his conviction and sentence for possession of cocaine with intent to distribute.  Mercer raises a number of issues on appeal.  They relate to the District Court's denial of a pre-trial motion to suppress, the conduct of the trial proceedings, and the District Court's sentencing determinations.  Finding no errors, we affirm.

## I.

On September 20, 2013, police pulled over the gold Saturn that Mercer was driving, arrested Mercer on the basis of outstanding warrants, and recovered, among other things, two ounces of cocaine from a search of the car.  Authorities then charged Mercer with one count of possession with intent to distribute cocaine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C).

Prior to trial, Mercer filed a motion to suppress the cocaine evidence on the ground that it was the fruit of an unconstitutional seizure of the Saturn.  The District Court denied the motion to suppress on May 29, 2014.  A jury trial was then held, resulting in Mercer's conviction.

The District Court sentenced Mercer to a term of imprisonment of 41 months.  The District Court's sentence was at the top end of the range that the pre-sentence report ("PSR") calculated under the United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G").  The PSR based that range on a total

offense level of 18, which included enhancements for obstruction of justice, U.S.S.G. §3C1.1, and possession of a dangerous weapon during the offense, U.S.S.G. §2B1.1(b)(1). The District Court also sentenced Mercer to a term of supervised release of five years and assessed monetary penalties. This appeal followed.

## II.

We start with Mercer's challenge to the District Court's denial of his motion to suppress. Mercer contends that the District Court erred in ruling that the stop of the Saturn was lawful. On a suppression motion, we review findings of fact for clear error and legal conclusions, including the ultimate reasonable suspicion determination, de novo. See United States v. Chhien, 266 F.3d 1, 5 (1st Cir. 2001). We conclude that the District Court did not err.

Mercer concedes, as he must, that the stop was lawful if law enforcement had reasonable grounds to suspect that Mercer was in possession of drugs at the time that police made the stop. See United States v. Arvizu, 534 U.S. 266, 273 (2002) ("[I]n brief investigatory stops of persons or vehicles, the Fourth Amendment is satisfied if the officer's action is supported by reasonable suspicion to believe that criminal activity 'may be afoot.'" (quoting United States v. Sokolow, 490 U.S. 1, 7 (1989))). But Mercer contends that the only basis law enforcement had for suspecting that Mercer would be in possession of such contraband

- 3 -

was his association with one man -- Richard Magee -- who law enforcement had reason to suspect was engaged in drug trafficking. And Mercer further contends that his mere association with Magee was not enough to justify the stop of the Saturn. See Ybarra v. Illinois, 444 U.S. 85, 90-91 (1979) (holding that officers "had no reason to believe" that patron of tavern "had committed, was committing, or was about to commit" any crime, where officers "knew nothing in particular about [patron], except that he was present, along with several other customers, in a public tavern at a time when the police had reason to believe that the bartender would have heroin for sale"); cf. Sibron v. New York, 392 U.S. 40, 62 (1968) ("The inference that persons who talk to narcotics addicts are engaged in the criminal traffic in narcotics is simply not the sort of reasonable inference required to support an intrusion by the police upon an individual's personal security.").

The record shows, however, that the officers knew, at the time of the stop, that:

- Magee supplied cocaine to a person by the name of David Jones;

- Magee and Jones would sometimes consummate drug deals at Ruski's, a restaurant in Portland, Maine;

- Magee planned to supply cocaine to Jones at Ruski's on September 20, 2013;

- 4 -

- Magee told Jones, in the course of an intercepted phone conversation that occurred on September 20, that he was running late to Ruski's, that Jones might want to come to Magee's house to consummate the drug deal, and that Jones should tell "Craig" to wait at Ruski's because he was still planning to go there;

- Magee at some point left his house and went to Ruski's, where agents observed a man -- whom we now know to be Mercer -- who "appeared to be waiting for someone" and who was "kind of pacing up and down the sidewalk";

- Magee, upon arriving at Ruski's, approached Mercer's Saturn, conversed with Mercer, and at one point "leaned inside the driver's window [of the Saturn], which was down, just for a moment";

- Magee then went inside Ruski's, gave a package to a female bartender, exited Ruski's, and conversed with Mercer yet again, at one point "leaning on the passenger door window" of the Saturn;

- Mercer shortly thereafter departed in his Saturn, without ever having entered Ruski's or interacted with anyone besides Magee; and

- Magee interacted with no one else at Ruski's.

We have little trouble concluding that law enforcement reasonably suspected a relatively close association between Mercer and Magee, given the content of the September 20 conversation and the interactions between Mercer and Magee at Ruski's. We also have little trouble concluding further that, based on the circumstances under which Magee and Mercer interacted, law enforcement reasonably suspected that Magee transferred cocaine to Mercer at Ruski's and that, accordingly, Mercer possessed cocaine at the time of the stop.

In this regard, we note that while, on their own, the reference to "Craig" in the September 20 conversation and Mercer's behavior at Ruski's "could admit of several potentially innocent explanations," United States v. Tiru-Plaza, 766 F.3d 111, 121 (1st Cir. 2014), such facts could also "reasonably give rise to a suspicion" of criminal activity when taking into account the totality of the circumstances, id. The record shows that the reference to "Craig" was made in the context of a drug-related conversation (albeit between Magee and Jones) and that Magee instructed Jones to have "Craig" wait for him at Ruski's, a place where Magee had dealt drugs in the past. Moreover, the record shows that Magee briefly "leaned inside" the window of Mercer's Saturn and that Mercer never went inside Ruski's (which one might reasonably expect him to do if the visit were simply a social one). When viewed in context, then, the facts collectively establish

- 6 -

reasonable suspicion to believe that Mercer and Magee were engaged in a drug transaction at Ruski's. See United States v. Arnott, 758 F.3d 40, 44 (1st Cir. 2014) (stating that "reasonable suspicion . . . deals with degrees of likelihood, not with certainties or near certainties," and allows "police officers to draw upon their experience and arrive at inferences and deductions").

In contending that law enforcement lacked reasonable suspicion to stop the Saturn, Mercer notes that officers did not actually observe any transfer of drugs and that the officer who testified at the suppression hearing "never testified [that] Magee's hands or torso went inside the Saturn," which one might expect if there had been a transfer of drugs. But the officer at the suppression hearing testified that the observing officers' vantage points prevented them from being able to see either the interior of the Saturn or Magee hand anything off to Mercer. And the officer testified that it was "normal" for officers not to see the drugs involved in a drug deal. As nothing in the record renders this testimony incredible, we conclude that the features that Mercer emphasizes do not, as Mercer contends, negate

reasonable suspicion of a drug transfer.  See Arnott, 758 F.3d at 44.[1]

In sum, Mercer is not like the "unwitting tavern patron" in Ybarra.  Wyoming v. Houghton, 526 U.S. 295, 304 (1999).[2]  Nor was the interaction between Magee and Mercer one for which law enforcement would have been justified in suspecting only an innocent purpose.  Rather, law enforcement reasonably suspected that Mercer was going to Ruski's to participate in a drug deal and that a drug exchange actually occurred at Ruski's.  Thus, the District Court did not err in denying the suppression motion.

---

[1] Mercer also notes that Magee did not actually refer to any drug deal at Ruski's besides the one with Jones (which apparently ended up taking place at Magee's house) and that officers did not observe Mercer engage in any obvious drug activity.  But the absence of these circumstances does not negate reasonable suspicion, given the picture created by the evidence as a whole.

[2] This case is also a far cry from Reid v. Georgia, 448 U.S. 438 (1980), on which Mercer also relies.  There, the DEA stopped an individual in a Florida airport based on the fact that the person "appeared to . . . fit the so-called 'drug courier profile,' a somewhat informal compilation of characteristics believed to be typical of persons unlawfully carrying narcotics."  Id. at 440. The Court concluded that the circumstances underlying that profile were so general that they "describe[d] a very large category of presumably innocent travelers."  Id.  Law enforcement did not, however, rely on a profile in this case.  Rather, law enforcement relied on an "emerging tableau" of events that sufficed to create individualized reasonable suspicion.  Chhien, 266 F.3d at 6.

## III.

Mercer's next challenge to his conviction concerns the government's purported violation of Fed. R. Crim. P. 16(a)(1)(B), a mandatory discovery rule. That rule provides in relevant part:

> Upon a defendant's request, the government must disclose to the defendant . . . any relevant written or recorded statement by the defendant if the statement is within the government's possession, custody, or control; and the attorney for the government knows -- or through due diligence could know -- that the statement exists.

Id. Mercer contends that the prosecution violated this rule by turning over too late a batch of Mercer's phone records. Mercer thus seeks reversal on the ground that the District Court improperly permitted the prosecution to use a piece of the late disclosed evidence -- namely, a potentially incriminating text message -- in its rebuttal.

"To succeed in obtaining a reversal on appeal [for a Rule 16 discovery violation], a defendant must prove both an abuse of discretion and prejudice." United States v. Alvarez, 987 F.2d 77, 85 (1st Cir. 1993). The government does not contest that a discovery violation occurred.[3] Proceeding on the assumption that

---

[3] The parties agree that a violation of the discovery rule occurred, but the record does not reveal when Mercer requested the relevant material, or when the District Court requested that the government provide such material in accordance with Fed. R. Crim. P. 16(a)(1)(B). Nor does the record disclose by what date the government was supposed to provide such material to Mercer. Further, it is not clear from the record when the government actually disclosed the phone records. Mercer contends that the

one did occur, we nevertheless conclude that the District Court did not abuse its discretion in permitting the use of the text message.

In deciding whether to permit the use of the text message, the District Court expressly asked trial counsel about prejudice. Trial counsel's assertions of prejudice -- "my defense preparation would have been different" and "it fundamentally changes in some way whether I would move toward, for example, recommending a plea disposition" -- were very generalized. See United States v. Arboleda, 929 F.2d 858, 864 (1st Cir. 1991) (noting, in finding no prejudice as would justify reversal on appeal, that trial counsel's generalized allegations of prejudice -- that the defense would have been conducted "differently" -- were insufficient); United States v. Gladney, 563 F.2d 491, 494-95 (1st Cir. 1977) (concluding that the defendant's claim of prejudice, which "boil[ed] down to the argument that had his [trial] counsel learned earlier of the [late disclosed evidence] he might have advised a guilty plea and would, in any event, have insisted that his client not discredit himself by telling an obvious lie," was not "of sufficient moment to justify

_____

evidence was turned over five to seven business days before trial. But the record provides some indication that the evidence was turned over on October 21, 2014, which was two weeks -- or about ten business days -- before trial. Finally, the record does not reveal how much evidence was belatedly disclosed to Mercer.

a reversal"). Moreover, trial counsel never requested a continuance when confronted with the late disclosed evidence, which lends support to the conclusion that the District Court did not abuse its discretion. Cf. Gladney, 563 F.2d at 494 ("[T]he district court did not abuse its discretion by admitting the [late disclosed evidence] after first inquiring about a continuance and being advised by [the defendant] that none was desired."). Finally, any prejudicial impact of the text message was undercut, as the properly disclosed evidence of Mercer's dealings with Magee arguably played a similar role as the text message in terms of refuting Mercer's defense to the cocaine possession count (which was based on an absence of knowledge of the cocaine). We therefore conclude that the District Court did not abuse its discretion in permitting the use of the text message.

Mercer does also contend that the government acted in bad faith in disclosing the evidence when it did. See United States v. Delgado-Marrero, 744 F.3d 167, 198 (1st Cir. 2014). But even assuming the government's bad faith could alter our conclusion, the record does not support Mercer's contention in that regard.

To be sure, it appears that the prosecutor could have discovered and disclosed the evidence earlier. But that fact alone -- which is all that the record affirmatively supports -- does not itself establish bad faith. See id. at 494

- 11 -

(contrasting lack of due diligence, which may or may not constitute bad faith, with the deliberate withholding of information, which is the prototypical example of bad faith).  And we have special reason to reject Mercer's claim of bad faith, as trial counsel not only did not allege bad faith, but also expressly conceded that the prosecutor was an "honest man" who legitimately communicated that he would not use the late disclosed evidence in his case-in-chief.  See Arboleda, 929 F.2d at 864 ("No allegations that the government delayed production in bad faith were made by the defendants to the district court.  In fact, early on at trial[,] counsel for [one of the defendants] made clear he did not mean to impugn the government's motives, and he expressed no change in this opinion as the trial went on and disclosures increased.").[4]

_____

[4] Relatedly, Mercer contends that his trial counsel was ineffective in failing to review the contents of the late disclosed evidence before trial and in failing to move for a continuance at trial once the government sought to exploit the late disclosed evidence in rebuttal.  But there are significant uncertainties in the record that bear on whether trial counsel's performance was deficient and whether trial counsel's performance prejudiced Mercer.  See, e.g., supra note 3.  Accordingly, we follow our usual course and decline to decide this question on direct appeal, leaving any consideration of it to a collateral challenge, should Mercer choose to make one.  See United States v. Kenney, 756 F.3d 36, 48-49 (1st Cir. 2014); United States v. Santiago-González, ___ F.3d ___, 2016 WL 3162813, at *3 (1st Cir. 2016) (concluding that the record was too "undeveloped" to render the Court able to "reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time" (quoting Strickland v. Washington, 466 U.S. 668, 689 (1984))).  Mercer may request that the District Court appoint counsel for him.

Mercer's next challenge to his conviction is that the prosecutor improperly questioned him about facts not in evidence and thus violated his Sixth Amendment rights to confrontation and to an impartial jury. Specifically, Mercer challenges the fact that the prosecutor questioned him about the extent of his phone interactions with Magee without having first developed a proper evidentiary foundation, such as by entering the underlying phone records into evidence. See United States v. Ofray-Campos, 534 F.3d 1, 18 (1st Cir. 2008) ("The Sixth Amendment requires that the jury's verdict must be based solely upon the evidence developed at trial.").

There was no objection to this line of questioning below, and so the parties agree that we review for plain error. See United States v. Ríos-Hernández, 645 F.3d 456, 462 (1st Cir. 2011) ("A party seeking to survive the onerous challenge of plain error review 'must show: (1) that an error occurred (2) which was clear and obvious and which not only (3) affected the defendant's substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings.'" (quoting United States v. Ahrendt, 560 F.3d 69, 76 (1st Cir. 2009))). We find none.

Given the other evidence tying Mercer to Magee, such as the officers' observations of the two acting suspiciously in the

immediate run-up to Mercer's arrest, Mercer's bare assertion that the jury was likely influenced by the line of questioning at issue is insufficient to show that his substantial rights were prejudiced.  See United States v. Rodríguez, 525 F.3d 85, 97 (1st Cir. 2008) ("The mere possibility that the jury may have speculated [about the insinuations created by evidence that should not have been admitted] does not rise to the level of plain error.").

**V.**

We now turn to Mercer's challenges to his sentence.  None have merit.

**A.**

Magee first contends that the District Court erred by applying the sentencing enhancement set forth in U.S.S.G. §2D1.1(b)(1) -- the so-called dangerous weapon enhancement.  Under the terms of that enhancement, "[i]f a dangerous weapon (including a firearm) was possessed" in the offense, the defendant's base offense level is increased by two levels.  Id.  Here, Mercer was in possession of a padlock in a bandana ("padlock-bandana") at the time of the arrest.  On that basis, the District Court applied the dangerous weapon enhancement to Mercer.

Mercer objected to the application of the enhancement below.  We thus review the District Court's legal determinations, including the applicability of the enhancement, de novo, and we

review the District Court's factual determinations, which must be supported by a preponderance of the evidence, for clear error. United States v. Lagasse, 87 F.3d 18, 21 (1st Cir. 1996). We conclude that the District Court did not err.

We set forth the framework for applying the enhancement in United States v. McDonald, 121 F.3d 7 (1st Cir. 1997). Once the government proves that "a [weapon] possessed by the defendant was present during the commission of the offense," "the burden shifts to the defendant to persuade the factfinder that a connection between the weapon and the crime is clearly improbable." Id. at 10.

Mercer asks us to "reconsider" the burden-shifting framework in McDonald because he contends that it "unfairly relieves the Government from proving this enhancement by a preponderance of the evidence, violating due process." But "[w]e are precluded from considering that argument by the law of the circuit[,] under which we are 'bound by a prior panel decision, absent any intervening authority.'" United States v. Oliveira, 493 F. App'x 145, 146 (1st Cir. 2012) (quoting United States v. Grupee, 682 F.3d 143, 149 (1st Cir. 2012)); United States v. Napolitan, 762 F.3d 297, 309-10 (3d Cir. 2014).

Mercer does not challenge the District Court's conclusion that a padlock-bandana constitutes a "dangerous weapon." Nor does Mercer contest that he was in possession of a

padlock-bandana at the time of his arrest.  The only question for us, then, is whether the District Court clearly erred in concluding that Mercer did not "demonstrat[e] the existence of special circumstances that would render it 'clearly improbable' that the weapon's presence has a connection" to the offense of conviction. United States v. Corcimiglia, 967 F.2d 724, 728 (1st Cir. 1992); United States v. Preakos, 907 F.2d 7, 9 (1st Cir. 1990) (identifying the standard as one of clear error).  We cannot say that the District Court did.

The District Court reasonably found that Mercer's contention that he carried the padlock-bandana for purposes of his job providing security services for escorts and not for purposes of drug trafficking "merely indicates [that Mercer] uses [the padlock-bandana] for multiple purposes."  See United States v. Quiñones-Medina, 553 F.3d 19, 24 (1st Cir. 2009) ("The presence of an alternative basis for the possession of a weapon does not render a finding of a protection-related purpose clearly erroneous."); United States v. Ruiz, 905 F.2d 499, 508 (1st Cir. 1990) (concluding that the connection between a weapon and a drug offense was not vitiated solely by the fact that the defendant "was compelled to carry the [weapon] by virtue of his employment" as a law enforcement officer).  The District Court also reasonably found that drug dealers use weapons "to protect themselves and the drugs from outside parties" and thus that Mercer's friendly relationship

with his drug trafficking partners did not negate the connection between the padlock-bandana and the offense of conviction. See Preakos, 907 F.2d at 9 (concluding that "the district court was permitted to make the reasonable inference that defendant used one or more of the firearms [found] to protect his drug operation," where the defendant was involved in a long-standing conspiracy to distribute cocaine with several other partners); cf. Quiñones-Medina, 553 F.3d at 24 (noting that the presence of a weapon is made more foreseeable by the fact that the value of the contraband is "substantial"). Finally, the District Court reasonably found that Mercer's weapon of choice -- a padlock-bandana as opposed to a firearm -- did not undermine the application of the enhancement, as Mercer concedes that he used the padlock-bandana for at least some protection purposes (namely, the protection of escorts as part of a security job). Thus, Mercer's challenge to the dangerous weapon enhancement fails.

**B.**

Mercer also contends that the District Court erred in applying the sentencing enhancement set forth in U.S.S.G. §3C1.1 -- the so-called obstruction-of-justice enhancement -- to him. That enhancement applies "[i]f (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice . . . , and (2) the obstructive conduct related to . . . the defendant's offense

of conviction." Id. The obstruction-of-justice enhancement "is not intended to punish a defendant for the exercise of a constitutional right." U.S.S.G. §3C1.1, cmt. 2. The enhancement does apply, however, if a defendant exercises his right to testify at trial but commits perjury in the process. Id. cmt. 4.

The parties agree that, if Mercer has not waived this claim, we review the District Court's application of the enhancement for plain error, given the absence of an objection below. We conclude that the District Court did not plainly err.

In concluding that the enhancement applied, the District Court found that Magee "perjured himself during trial." In reaching this conclusion, the District Court adopted the PSR's account as to the manner in which Magee committed perjury. The PSR provided in relevant part:

> During his trial, Mercer testified untruthfully. Specifically, he asserted that he never received drugs from Richard Magee. The evidence in this case established that Magee did supply drugs to Mercer. Based on the foregoing, since the defendant provided materially false information during his trial, he is subject to [the enhancement].

Mercer contends that the District Court erred by not independently making the findings necessary to warrant application of the enhancement. But the District Court was free to accept the undisputed portions of the PSR as findings of fact. See Fed. R. Crim. P. 32(i)(3) (providing that district courts "may accept any undisputed portion of the presentence report as a finding of

fact"). And, to the extent that Magee means to contend that the District Court did not make the findings necessary to support the finding that perjury occurred, we disagree.

A finding of perjury is sufficiently supported where a sentencing court makes findings that "encompass all the elements of perjury -- falsity, materiality, and willfulness." United States v. Matiz, 14 F.3d 79, 84 (1st Cir. 1994). "A sentencing court, however, is not required to address each element of perjury in a separate and clear finding. In fact, the [Supreme] Court in [United States v. Dunnigan, 507 U.S. 87 (1993)] affirmed a district court's finding [of perjury] that did not use the term willful." Id. (citation omitted).

Here, the District Court found that Magee provided "materially false" testimony when "he asserted that he never received drugs from Richard Magee." The nature of the material falsehood in this case is not one in which the willfulness of the falsehood could reasonably be questioned. We thus do not perceive any basis for concluding that the District Court, relying on the PSR and its assessment of the defendant's testimony, failed to make the requisite findings to support a finding of perjury. See Matiz, 14 F.3d at 84 (affirming district court's finding of perjury even though "the court was not explicit as to whether [the defendant's] testimony was material" because "the record demonstrate[d]" that the testimony was material).

- 19 -

Mercer also contends that the District Court's application of the enhancement impermissibly punished him for testifying and presenting his defense. But Mercer has no protected right to provide testimony that qualifies as perjury, see United States v. Shinderman, 515 F.3d 5, 20 (1st Cir. 2008), and Mercer does not contest the District Court's perjury finding. Thus, Mercer's challenge to the obstruction-of-justice enhancement fails.

## c.

That brings us to Mercer's contention that the District Court erred in relying upon dismissed charges in sentencing Mercer. The parties agree that we review for plain error, as there was no objection below.

The District Court referred to Mercer's dismissed charges at two points during Mercer's sentencing proceeding. The District Court first referred to dismissed charges in the context of concluding that Mercer's criminal history was not overrepresented and thus that Mercer was not entitled to a downward departure in his criminal history category. See U.S.S.G. §4A1.3(b). In that regard, the District Court stated:

> And then I look at other criminal conduct here, multiple charges of -- though I understand they're dismissed, including in 2012 an unlawful possession of a scheduled drug. And that's an interesting charge. The time -- the conduct indicates he was detained for speeding and operating a motorcycle recklessly in a residential neighborhood. He tells the policeman that he has a knife

- 20 -

in his pocket. Now, this is in spite of the fact he had a long history of weapons offenses. And the policeman takes the knife, thinking that the white residue is cocaine. Defendant admitted to law enforcement that he was a cocaine user, which indicates that he was in possession of cocaine, clearly, again another violation of the law. Apparently the white substance turned out to be lidocaine, not cocaine. This is not an individual who apparently learns from experiences.

The District Court then stated: "And then going into dismissed conduct, we've got the knife again in 2012 and this offense in 2013."

At no point, however, did the District Court rely on Mercer's dismissed charges. The District Court instead merely referred to Mercer's dismissed charges in the course of relying on certain conduct that took place in connection with the dismissed charges. Because that conduct was set forth in undisputed portions of the PSR, the District Court was entitled to rely on that conduct when sentencing Mercer. See Fed. R. Crim. P. 32(i)(3); United States v. Cortés-Medina, 819 F.3d 566, 570 (1st Cir. 2016). We thus perceive no plain error. See United States v. Paneto, 661 F.3d 709, 716 (1st Cir. 2011).[5]

## VI.

For the reasons given, we **affirm**.

---

[5] Mercer's argument that the Fifth and Sixth Amendments of the U.S. Constitution require that the facts comprising the dangerous weapon enhancement and the obstruction-of-justice enhancement be found by a jury beyond a reasonable doubt is foreclosed by our precedent. See United States v. Rivera-Rivera, 555 F.3d 277, 292 (1st Cir. 2009).